UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X

UNITED STATES OF AMERICA,

v.

ANALDO SAMUEL,

            Defendant.

-------------------------------------------------X

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ OCT 17 2014
BROOKLYN OFFICE

08 CR 722 (SJ)

**MEMORANDUM &
ORDER**

APPEARANCES

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
By:   Daniel A. Spector
       Assistant United States Attorney
Attorney for the Government

MICHAEL O. HUESTON
350 Fifth Avenue, Suite 4810
New York, NY 10118
Attorney for Defendant

JOHNSON, Senior District Judge:

In February 2009, Defendant Analdo Samuel ("Defendant") pleaded guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1349 and 3551 and one count of wire fraud in violation of 18 U.S.C. §§ 1343, 2, and

1

3551 ("Counts One and Two"); and two counts of aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1), (b) & (c)(5) ("Counts Three and Four"). At the time, the parties disputed issues related to Defendant's sentence, specifically: (1) whether Defendant's advisory Sentencing Guidelines range on Counts Three and Four, the aggravated identify theft charges, should run consecutively to each other, and (2) whether Defendant's sentence for Counts One and Two, the conspiracy and wire fraud charges, warranted an upward departure for his alleged participation in a 2006 kidnapping in London ("the London kidnapping"). As to the latter issue, a Fatico[1] hearing was held on March 11, 2011, during which the Government presented one witness. Defendant did not testify.

The initial sentencing on this matter took place on July 7, 2011. Based on the evidence and the parties' extensive submissions, the Court found that that the sentence on the aggravated identity theft counts should be imposed consecutively to each count, but rejected the Government's request for an upward departure based on the London kidnapping. Accordingly, Defendant's advisory Guidelines range was determined to be 105 to 119 months for all counts. This Court sentenced Defendant to 71 months incarceration, to run concurrently, on Counts One and Two and 24 months incarceration per count for a total of 48 months on Counts Three and Four. In addition, the Court ordered that incarceration for Counts One and Two would run consecutively to Counts Three and Four, sentencing Defendant to a total

---

[1] See United States v. Fatico, 603 F.2d 1053, 1057 n.9 (2d Cir. 1979).

2

P-049

of 119 months incarceration, to be followed by 3 years supervised release and the Court also ordered a $400 special assessment.

The Court held a second Fatico hearing on January 4, 2012 in order to address ongoing issues with the restitution amount imposed. After careful consideration of the statements by victims Margaret and Carlos Hernandez, as well as the submissions and argument by counsel and Defendant, the Court found Defendant responsible for restitution as well.

Defendant appealed to the Court of Appeals for the Second Circuit. The Second Circuit issued a mandate on October 10, 2013 remanding the case back to this Court pursuant to United States v. Jacobson, 15 F.3d 19, 22 (2d Cir. 1994), so that this Court could provide reasons for the sentence imposed. The mandate of the Second Circuit is addressed herein.

I. **Background**

A. **The Offenses**

Between August and December 2005, Defendant organized a fraud scheme by stealing the identities of two homeowners to obtain fraudulent mortgages and to sell their property, respectively, without their knowledge and consent.

In the first scheme, Defendant recruited Jessie Herriot to pose as a real homeowner to obtain refinancing mortgage loans on two properties in Brooklyn.[2]

---

[2] Herriot pleaded guilty to one count of conspiracy to commit wire fraud, for which he was sentenced to 42 months' imprisonment, and one count of identity theft, for which he was sentenced to 24 months' imprisonment. See United States v. Herriott, 07-CR-584 (E.D.N.Y.) (NG), Docket No. 14.

3

In furtherance of the scheme, Defendant: (1) paid for title searches to determine the owners of the properties; (2) contacted mortgage brokers to obtain loans on the two properties; (3) attended the closings with Herriot while pretending to be the homeowner's fictional son; (4) secured a false New York State driver's license with the homeowner's identification so that Herriot could use the documentation as proof of identification during the loan closings with the mortgage lenders; (5) retained attorneys (who had no knowledge of the scheme) to attend the closings and to assist with funds transfers of the loan proceeds to bank accounts in Switzerland; (6) directed his attorneys to issue checks in the name of Mildred Ramos and Miriam Montalvo; and (7) recruited Ramos and Montalvo, to cash these checks and to give him the money for a cut of the proceeds. The real homeowner had no knowledge of the loans or the transactions until the mortgage lenders contacted him regarding the delinquent payments on the loans.

In the second scheme, Defendant recruited an unindicted co-conspirator to impersonate a homeowner for the purpose of selling her Brooklyn properties to a third-party buyer without her knowledge. As in the first scheme, Defendant also contacted a mortgage broker to obtain loans on the properties, attended the closings with Herriot while pretending to be the homeowner's fictional grandson, and secured a false New York State driver's license with the homeowner's identification to use as proof of identification during the loan closings with the mortgage lender. Defendant also recruited Kenya Dinkins, his then-girlfriend, to

4

pose as the girlfriend of the homeowner's grandson at the closing and to cash checks derived from the proceeds of the sale.

## B. Sentencing Calculations and Objections

Defendant was arrested in December 2008 and pleaded guilty on February 18, 2009. At the plea hearing, the Government stated that it intended to seek an upward departure based on Samuel's alleged orchestration of a kidnapping in London in furtherance of the offenses to which he pleaded guilty. (Plea Tr. 14:18–15:10, Feb. 18, 2009 (Docket No. 27).)[3] According to the Government, Samuel suspected that one co-conspirator was stealing money from one of the Swiss bank accounts and organized a scheme to have a 10-year-old child related to a co-conspirator son kidnapped in London. The Government also asserted that Samuel recruited at least 5 individuals to carry out the kidnapping. In February 2006, the kidnapping was executed and the child was held captive for two days, and ransom demanded, until British law enforcement authorities rescued him. Three of the five kidnapping co-conspirators were convicted in a London trial court.

In the Pre-Sentence Investigation Report ("PSR"), the Probation Department incorporated the Government's assertions into the calculation of Defendant's offense level and Guidelines range. Relying on U.S.S.G. § 2B1.1, the PSR lists a base offense level of 7, see U.S.S.G. § 2B1.1(a), and 24 additional points for four specific offense characteristics:

---

[3] The Government subsequently filed its application for an upward departure on December 18, 2009. (See Docket No. 40.)

5

> (a) 16 points because the total intended loss amount was between $1 million and $2.5 million, U.S.S.G. § 2B1.1(b)(1)(I);
>
> (b) 2 points because Defendant used a Swiss bank account for the mortgage fraud wire transfers, thus committing a substantial portion of the fraudulent scheme overseas, id. § 2B1.1(b)(9)(B);
>
> (c) 2 points because Defendant organized the London kidnapping in furtherance of the instant offense, id. § 2B1.1(b)(13)(A); and
>
> (d) 4 points because Defendant was the leader an organizer of the conspiracy involving at least five participants, id. § 3A1.1(a).

(PSR ¶¶ 35–40.) The PSR also grouped Counts One and Two, see U.S.S.G. §§ 3D1.2, 3D1.4, with no effect on the offense level. (PSR ¶¶ 44–50.) However, the PSR adjusted 3 levels downward for Defendant's acceptance of responsibility, for a total offense level of 28. (PSR ¶ 51.) With a criminal history category of II, the Guidelines range is 87 to 108 months on Counts One and Two, plus a mandatory sentence of 24 months on Counts Three and Four to be imposed consecutively on each count and to the sentence for Counts One and Two, see U.S.S.G. § 2B1.6(a), for a total range of 135 to 156 months. (See PSR ¶¶ 117–18.) The Probation Department recommended a sentence of 108 months on Counts One and Two to run concurrently, and a sentence of 24 months custody to run concurrently on Counts Three and Four and consecutive to all other counts.

6

P-049

Defendant objected to the enhancements under U.S.S.G. §§ 2B1.1(b)(9)(B) & (b)(13)(A), arguing that the alleged kidnapping and wiring of money through Europe were not related to the offenses charged in the indictment and that the Court had no jurisdiction over the alleged kidnapping in Great Britain, and requested a Fatico hearing. (Def. Obj. at 1, June 10, 2009 (Docket No. 29).) The Government requested that the sentence for Counts Three and Four should run consecutively to each other and to the sentence for Counts One and Two, for a Guidelines range of 135 to 156 months. (Gov't Obj. at 3, June 15, 2009 (Docket No. 31).) The Government further argued an upward departure is warranted to account for Defendant's participation on the London kidnapping because he cannot be prosecuted in the United States for his criminal acts.[4] In support of its argument, the Government submitted, inter alia, the transcripts from the London trial, during which several alleged co-conspirators in the London kidnapping testified as to Samuel's orchestration of the crime. (See Docket No. 49.)

## II. Consecutive Sentences For Aggravated Identity Theft

The offense of aggravated identity theft requires a sentence of 24 months, which must run consecutively to any other term of imprisonment imposed by the court at the same time. See 18 U.S.C. § 1028A(b); see also U.S.S.G. § 2B1.6. The only exception to this statutorily mandated rule grants a district court discretion to

---

[4] The Government concedes that the § 2B1.1(b)(13)(A) enhancement is inapplicable because the London kidnapping cannot be considered relevant conduct under § 1B1.3. (See Gov't Ltr. at 3, Apr. 13, 2011 (Docket 60).)

7

run additional § 1028A sentences imposed at the same time concurrently with each other. Id. § 1028A(b)(4). A district court must exercise that discretion "in accordance with any applicable guidelines and policy statements issued by the Sentencing Commission." Id. In determining whether to run additional § 1028A sentences concurrently with or consecutively to each other, the Court must consider a "non-exhaustive" list of factors, including: (1) the "nature and seriousness of the underlying offenses," (2) the groupability of the offenses under U.S.S.G. § 3D1.2, and (3) whether "the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2) are better achieved by imposing a concurrent or a consecutive sentence." See U.S.S.G. § 5G1.2 cmt. n.2(B).

As to the first factor, the nature and seriousness of the conspiracy and wire fraud offenses support consecutive sentences. Defendant was the leader and organizer of two separate fraud schemes involving separate transactions and separate victims. He recruited Herriot and Dinkins to impersonate the home owners and/or their family members and supplied them with false identification documents for the purposes of completing loan applications or participating in loan closings. He also recruited others to cash the checks generated from the transactions. Defendant deceived not only the homeowners to execute the schemes, but also the attorneys, mortgage lenders, and mortgage brokers who thought they were facilitating legitimate real estate transactions.

P-049

The second factor required the Court to consider whether to group counts involving "substantially the same harm," except for counts for which the statute specifies a consecutive term of imprisonment to be imposed. See id. § 3D1.2 & cmt. n.1. The PSR grouped Counts One and Two, the conspiracy and wire fraud charges, per § 3D1.2(d), whether the offense level is determined largely on the basis of the total amount of harm or loss. (See PSR ¶ 44.) The PSR also excluded Counts Three and Four from grouping because § 1028A specifies a consecutive sentence. (See PSR ¶ 45 (citing §§ 2B1.6 and 3D1.1(b)(2).) The Court adopted the PSR's findings regarding groupability as accurate and thus supporting a consecutive sentence.

Finally, the Court considered "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. 3553(a)(2). The Court already opined on the seriousness of the offense to support consecutive sentences. As to the remaining § 3553(a)(2) factors, the Court believed that consecutive sentences would deter Defendant from engaging in elaborate fraud schemes and would protect other unsuspecting homeowners from similar nefarious conduct. Further, consecutive sentences would give Defendant

P-049

adequate opportunity to benefit from educational and correctional programs and treatment.

Accordingly, the Court exercised its discretion to impose sentences on Counts Three and Four that are consecutive to each other, for a total sentence on both counts of 48 months.

### III. Upward Departure Based on the London Kidnapping

The Government requested an upward departure of Defendant's sentence to 288 months, combining the consecutive sentence of 48 months for Counts Three and Four, see 18 U.S.C. § 1028A, with the statutory maximum of 240 months for Counts One and Two, see id. § 1343. The Government argued: (1) a substantial part of the fraudulent scheme (i.e., wire transfers to co-conspirators Swiss accounts to co-conspirators in the London kidnapping) occurred outside of the United States, warranting a 2-point increase in the offense level calculation, see U.S.S.G. § 2B1.1(b)(9)(B); and (2) Defendant's overall participation in the London kidnapping warranted an upward departure pursuant to U.S.S.G. § 5K2.0 or, in the alternative, 18 U.S.C. § 3553(a).[5]

### A. The Fraudulent Scheme Did Not Occur Outside the United States

---

[5] At the conclusion of the Fatico hearing, the Government argued that its request for an upward departure relies primarily on 5K2.0 and § 3553(a). (See Fatico Tr. 32:1–13, 33:2–8.) In post-hearing submissions, however, the Government calculated Defendant's offense level for Counts One and Two as 26, which still includes a 2-point enhancement under § 2B1.1(b)(9)(B). (See Gov't Ltr. at 3, Apr. 13, 2011.) Defendant maintained his objection to this enhancement, and thus the Court addresses it.

10

P-049

Under U.S.S.G. § 2B1.1(9)(B), a 2-level increase in the offense level applies if "a substantial part of a fraudulent scheme was committed from outside the United States[.]" The Government is required to prove the facts necessary to support an enhancement by a preponderance of the evidence. See United States v. Hernandez, 83 F.3d 582, 585 (2d Cir. 1996).

The Court finds that the Government has not met its burden. During the Fatico hearing, Dinkins testified that Defendant sent money to Dawn Fields, a former girlfriend and mother of one of Defendant's children. (Fatico Tr. 13:16–15:20, Mar. 11, 2011.) Dinkins further testified that Fields was in the music business and that Defendant said he was giving Fields funds for her project. (Mar. 11, 2011 Fatico Tr. 14:4–7, 10–12.) Dinkins also stated that Defendant said he sent the funds to Switzerland. (Mar. 11, 2011 Fatico Tr. 14:12–14.). But on cross-examination, Dinkins stated that she did not know the source of the money that Defendant sent Fields, nor did she know if Defendant obtained the funds from his fraudulent schemes. (See Mar. 11, 2011 Fatico Tr. 24:11–18.) As an aside, it appeared the Government conceded this point at the hearing. (Mar. 11, 2011 Fatico Tr. 32:6–11.)

The Court was mindful of Dinkins' relationship with Defendant, as they have a child in common, but found Dinkins to be a credible witness. Dinkins' testimony established that Defendant provided financial support to Fields and that the funds were sent to Switzerland. However, it fell far short of proving, even by a

11

preponderance, that the funds sent to Fields in Switzerland were the same funds derived from the fraudulent scheme, or that a "substantial" part of Defendant's scheme took place outside of the United States. Accordingly, the Court rejected the 2-point enhancement under § 2B1.1(b)(9)(B).

### B. U.S.S.G. § 5K2.0 Was Not Applicable

Guideline § 5K2.0 permits departure from the Guidelines range upon a finding of "an aggravating or mitigating circumstance" not considered by the Guidelines range. For the London kidnapping to provide a basis for upward departure, a court must determine that it is sufficiently related to the offenses of conviction, i.e., "relate[s] in some way." See United States v. Kim, 896 F.2d 678, 684 (2d Cir. 1990).

The Court was not convinced that the London kidnapping was sufficiently related to the conspiracy, wire fraud, and aggravated identity theft charges. In this case, the Government did not show that the London kidnapping was tied to Defendant's sentencing just because of its temporal proximity to the offenses of conviction. See United States v. Uccio, 917 F.2d 80, 86 (2d Cir. 1990); United States v. Tropiano, 50 F.3d 157, 164 (2d Cir. 1995). In addition, the Government did not demonstrate that the London kidnapping concerned the proceeds involved in the fraud counts or that the conduct related to the fraud counts. The Government did not conclusively show Defendant's involvement in the kidnapping. Nor did the Defendant have a foreign conviction relating to these allegations. The Court

P-049

therefore rejected the argument for an upward departure based on the details of the London kidnapping.

### C. § 3553(a) Does Not Compel an Upward Departure

The Court is charged with imposing a sentence "sufficient, but not greater than necessary" to achieve sentencing goals after considering several factors. See § 3553(a)(1). After considering the § 3553(a) factors, the Court declined to upwardly depart from the Guidelines range. Defendant was not tried in London and therefore had no opportunity to respond to the evidence upon which the Government relied. Further, the statements Defendants made at the proffer session—i.e., that he asked his attorney to wire money to Switzerland—were consistent with, not contrary to, Defendant's previous argument that the Government wanted the Court to infer that the funds involved in the kidnapping were the same proceeds obtained in the fraud. The Court rejected this argument.

### IV. Calculation of Offense Level and Sentencing Guidelines Range

For the foregoing reasons, the Court rejected a 2-point enhancement under U.S.S.G. § 2B1.1(b)(9)(B) and denied the Government's request for an upward departure for participation in the London kidnapping. Defendant's offense level was calculated as follows:

| | |
|---|---|
| Base offense level, U.S.S.G. §§ 2X1.1(a), 2B1.1(a)(1) | 7 |
| Loss amount of $1 million to 2.5 million, id. § 2B1.1(b)(1)(I) | +16 |
| Leader/organizer of a conspiracy involving at least 5 participants, | |

13

|  |  |
|---|---|
| id. § 3A1.1(a) | +4 |
| Acceptance of responsibility | <u>-3</u> |
| **TOTAL OFFENSE LEVEL** | **24** |
| **CRIMINAL HISTORY CATEGORY** | **II** |
| **GUIDELINES RANGE (Counts One and Two)** | **57 to 71 months** |
| **GUIDELINES RANGE (Counts Three and Four)** | **48 months** |

Because Defendant had a criminal history category of II and total offense level of 24, the applicable advisory Guidelines range for all counts was 105 to 119 months.

### V. Reasons for the Sentence Imposed

At the time of sentence, this Court sentenced the Defendant at the top of the applicable advisory Guideline Range. As set forth above, the Court did not conclude that a 2-point enhancement for the allegations involved in the London kidnapping was appropriate and declined to upwardly depart in determining the applicable Guidelines range. However, it is clear to this Court that the crimes charged here warrant a serious sentence. The victims appeared in court to testify, seeking restitution (which was granted) for attorneys' fees for counsel who initiated the investigation when the police were unsure of what steps to take, who was present while they testified in court, and who represented them when they were questioned by Scotland Yard and were otherwise exposed to liability through the aggravated identity theft that occurred here. (Jan. 4, 2012 Fatico Hrg. at 6-8.) The

14

victims quantified their total losses relating to legal matters as exceeding $250,000 and their total losses in the course of these incidents, including ongoing inability to work on their own properties, as exceeding $1.3 million.

We live in the information age. In the law, we refer to malum in se and malum prohibitum crimes. Malum in se crimes are those acts considered to be wrong in themselves, or by nature. Common examples include rape and murder. Malum prohibitum crimes are those acts which are wrong only because they are forbidden by the State. While these distinctions were clear at common law, the boundaries blur as the world becomes increasingly governed by sophisticated transactions which occur largely in cyberspace. In this context, identity theft has an enhanced impact and potentially unbounded and devastating effects to its victims.

As set forth above, the crimes committed by Defendant Samuel involved more than playing with numbers and moving money around. He received money from loans issued in other people's names, based on assets that they held, he sold their properties, and he wreaked havoc with lives in a manner from which it has been very difficult for the victims to recover or be made whole. During her testimony, one of the victims noted that they have no recourse for most of their financial losses, including clearing the title to their own properties and repairing the damage to their credit and holdings. Defendant paid for title searches to find vulnerable people, created false identification documents, and impersonated strangers in the furtherance of this scheme − with no regard to whether these

15

strangers could afford this loss. Whether or not the Defendant recognizes the gravity of these crimes, real people bore the brunt of his misconduct. The Court is mindful that, at any moment in this sophisticated scheme, the Defendant could have chosen to consider who he was victimizing. Instead he continued in this complicated endeavor to obtain other people's money, irrespective of the fact that he could be destroying them financially. The Court's sentence at the top of the Guideline range reflected this sobering reality.

### VI. Conclusion

Based on the calculations and given the reasoning set forth above, the Court imposed a sentence of 119 months' incarceration, 3 years' supervised release, restitution, and a $400.00 special assessment. In addition, the Court herein sets forth detailed reasoning pursuant to the mandate of the Court of Appeals for the Second Circuit.

**SO ORDERED.**

DATED: October 17, 2014
Brooklyn, New York

/s/ USDJ Johnson

Sterling Johnson, Jr., Senior U.S.D.J.

16